1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                        FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   LINNA YE,                                  No.  2:13-cv-0972 MCE CKD P

12                  Petitioner,

13         v.                                    FINDINGS AND RECOMMENDATIONS

14   DIRECTOR OF CORRECTIONS AND
     REHABILITATION,
15
                    Respondent.
16

17

18         Petitioner, a state prisoner, is proceeding pro se with a petition for writ of habeas corpus

19   pursuant to 28 U.S.C. § 2254.  In 2008, petitioner was convicted by a jury of second degree

20   murder and sentenced to a state prison term of 15 years to life.  She asserts several claims

21   challenging her conviction as violative of her Constitutional rights.  (ECF No. 1 ("Ptn."))  The

22   petition is fully briefed.  (ECF Nos. 13, 16.)  Upon careful consideration of the record and the

23   applicable law, the undersigned will recommend that the petition be denied.

24                                      BACKGROUND

25   I.  Facts

26         In its affirmation of the judgment on appeal, the California Court of Appeal, First

27   Appellate District, set forth the factual background as follows:

28   ////

                                                  1

Edward Reding (hereafter, Edward) died on November 3, 2003.  In June 2004, Linna Ye was charged with his murder and released on bail.  Due to several continuances, the case did not initially go to trial until April 2007 (first trial).  That jury could not reach a unanimous verdict and the court declared a mistrial.  A second trial began on March 25, 2008. After an unsuccessful <u>Marsden</u> motion [footnote omitted] on the second day of trial, Ye stipulated to dismissal of the jury and declaration of a mistrial. Ye was appointed new counsel the next day and a third trial commenced September 23, 2008. Because the case against Ye was largely circumstantial, we discuss the evidence in some detail.

*Trial Evidence at Ye's Third Trial*

 Ye lived with Edward and his son, Dr. Michael Edward Reding (Reding), in Benicia at the time of Edward's death. She and Reding were romantically involved on and off from the year 2000 to September 2003. They had a rocky relationship.  In August 2002, Ye moved into Reding's home (the Reding home) with her 14–year–old son, D. In the summer of 2003, Reding's son, Michael Reding Jr. (Michael Jr.) also lived in the home during his summer break from college. Edward came to visit in August 2003 and stayed through November 3, 2003. Reding's master bedroom and bathroom were on the top floor of the two-story house; D.'s and Michael Jr.'s bedrooms were downstairs where another bathroom was located; and Edward stayed in a fold-out bed in the downstairs family/living room. Ye stayed in the upstairs bedroom with Reding until September 2003, when she moved downstairs into Michael Jr.'s vacant bedroom.

After Ye moved in, her relationship with Reding deteriorated and he repeatedly asked her to move out, but she did not. During Edward's August 2003 visit, he fell and hit his head while getting on a paratransit bus, and he was hospitalized for five days. After this incident, he needed greater support at home. Shortly after Edward's return from the hospital, Reding attended a health retreat in New York.  Michael Jr. agreed to look after Edward until he went back to school the weekend before Reding's return. Ye agreed to look after him on the final weekend. A dispute arose between Reding and Ye about whether Ye adequately cared for Edward that weekend.

*September to November 2003*

When Reding returned from his trip, he told Ye to move to Michael Jr.'s bedroom (as he had gone back to college) and to move out. Reding consulted a lawyer about how to get Ye out of the house without conflict, since she had not complied with his previous requests.  Reding asked Ye to leave many times, every few days, and she usually responded with a threat. The first threat she made was, "'Have you ever heard of [F]atal [A]ttraction? Well, that could happen.'"  At other times she said, "'If you press me to leave, I will kill you, and kill myself.'"; "'If you press me to leave I will—you will die.'"; "'If you kick me out, I will destroy you.'"; "'If you carry through with this plan to get me to leave your house,

2

something could happen that you'll regret for the rest of your life.'" Reding offered Ye several thousand dollars to help her find a new home and move out. She responded, "'It will take $60,000 to make me leave,'" but Reding would not agree to pay that amount. Michael Jr. and Reding's family law attorney (who had not testified at the earlier trials) testified that Reding told them before Edward's death about Ye's threats. Ye did not specifically testify about the alleged threats.

Reding also described two incidents between September and November 2003 when Ye yelled at Edward. In the second incident, Ye became "very agitated, and began shaking her fist at [Edward] and coming towards him. [Reding] became concerned that she was going to attack him," so he stepped in front of her, which effectively ended the altercation. Ye acknowledged certain disagreements with Edward. However, she characterized them as within the range of ordinary family arguments and testified that she had developed a good relationship with Edward during his prior visits but withdrew in the fall of 2003 because she was planning to move out.

*November 3, 2003*

Steven Sims, a dispatcher for the Dial–a–Ride program of Benicia Transit, testified that Edward was scheduled to be picked up at 2:15 p.m. on November 3, 2003. As a courtesy, Sims called to remind Edward and confirm the pickup, but there was no answer, which was unusual. Sims identified the fifth entry on People's Exhibit 3 (Reding's home phone records) as the unanswered call he described. He further testified that when the Dial–a–Ride driver arrived at the Reding home at 2:10 p.m., Edward was a no show which was also unusual.

D. testified that he arrived home from school on November 3, 2003, at about 3:20 p.m. He heard water running in the downstairs bathroom, but at first did not see anyone there. Ye was not home, although she was usually home when D. returned from school. D. looked into the bathroom door again and saw Edward lying on the floor with blood on his face. D. panicked for a couple of minutes and then decided to call his mother. He reached her by phone at about 3:38 p.m. D. then called a friend to ask if he could stay at the friend's house. He was told he could, so he called a taxi and waited outside. D. waited about 70 minutes for the taxi, but it did not arrive. FN2 Eventually, an ambulance and a police car pulled up to the house and Reding arrived.

FN2. D. testified that he did not call 911 during the approximately 70 minutes after he saw Edward on the bathroom floor because he was panicking. Also, he had told his mother about the situation and asked her if she was going to inform Reding, so he assumed "the adequate amount of people would have known[ ] to be able to take care of it."

Gregory Petersen, a paramedic, entered the house sometime after 4:00 p.m. and heard water running. He went to the downstairs

3

1
2
3
4
5

bathroom, saw the tub was full to the top, and turned off the water. Edward's head was propped up against the bathtub, with his chin touching his chest. Petersen pulled Edward a couple of inches away from the tub to open the airway, but the chin remained in the same position. His arms were also stiff, indicating rigor mortis. Dr. Arnold Josselson, a forensic pathologist, testified that rigor mortis, the stiffening of muscles after death, usually becomes apparent in the limbs within two to four hours after death, "but it can vary quite a bit."

6
7
8
9
10
11
12
13

Reding testified that on November 3, 2003, he awoke at about 7:00 a.m. and his father was already awake and dressed. Edward usually got up at 5:00 or 6:00 a.m., took his vitamins, ate cereal or oatmeal very early in the morning, and read the paper. When Reding left for work, his father was the only one home. Reding had a normal day at work (as a child psychiatrist at Kaiser Permanente Medical Group in Vallejo) seeing patients, consulting with colleagues, and eating lunch. At about 4:30 p.m., he accessed his voice mail and retrieved two messages from Ye.  In the first message, which was left at about 3:50 p.m., Ye said that D. had found Edward on the floor in the bathroom when he came home from school and Reding should go quickly to see what was the matter because she was out of town. The second message, received at 4:20 p.m., was similar. Reding drove home and called 911 en route. When he arrived at the house at about 5:00 p.m., the paramedics had already arrived.

14
15
16
17
18

Ye testified that on November 3, 2003, D. woke her up and she went into the downstairs bathroom to comb her hair and wash up. While she was sleeping downstairs, she sometimes used the upstairs bathroom to shower but she used the downstairs bathroom to comb her hair, among other things. D. testified that Ye regularly used the downstairs bathroom. Wilson, the family law attorney, testified that when he later met Ye at the Reding home so she could remove her property, she carefully searched each room for her things but did not enter or take anything from the downstairs bathroom.

19
20
21
22
23
24
25
26

After Ye used the bathroom, she took her son to school. When she returned after the 30–minute trip, Reding was still home. She then made Edward breakfast and ate with him as he took his pills. She left sometime between 9:30 and 9:50 a.m.  She drove directly to the Benicia public library (a 15–minute trip) and checked out two books that were later found in her car.  She then drove straight to the freeway and crossed the bridge to San Mateo, where her parents and brother lived. Ye called her parents en route to let them know she was coming over. She went to San Mateo to show her parents D.'s birthday pictures (he had turned 16 in November 2003), and to take care of a payment issue related to her rental property in San Jose. She spent the day with her parents and planned to return to Benicia at about 3:30 p.m. Ye's mother generally corroborated Ye's testimony.

27
28

As Ye was getting on Highway 101 to return to Benicia, she received a call from her son at about 3:37 p.m. D. told her that Edward was on the bathroom floor with blood on his head and the water was running. Ye exited the freeway, pulled over, and at 3:49

4

p.m. called Reding at his Kaiser office.  Although Reding also had what she called a "car phone," she expected him to be at the office and she had always been able to reach him there.  She did not call 911 because she knew Edward had fallen before without being seriously hurt and she thought it best to let Reding handle the situation. She called Reding again at 4:21 p.m.  At 4:35 p.m., she called what the prosecutor referred to as Reding's cell phone because she thought Reding might have rushed back to the house in response to her earlier call or calls. She never reached Reding.

*Initial Investigation on November 3, 2003*

Tom McBroom, a Benicia police detective, testified that he observed tools lying on the sink countertop and toilet of the downstairs bathroom, and it appeared the bathtub had overflowed. The bathtub was filled to the brim, there was water on the floor, bath mats that had been on the bathroom floor were wet, and a small area of the carpeting outside the bathroom door was "saturated" with water.   (D. testified the carpeting outside the bathroom door was dry when he discovered Edward.)   McBroom walked through the house to check for signs of ransacking or forced entry and found none.  However, the house was "clearly cluttered" and even "extreme[ly] cluttered" as shown on photographs received in evidence.

McBroom testified that the deputy coroner, Jim Burton, arrived at 7:30 p.m. and entered the bathroom. Burton told McBroom there was no evidence the bathroom was a crime scene, although he could not explain the injuries to the victim's forehead and would therefore request an autopsy. McBroom helped Burton put the body in a body bag.  Burton laid the bag next to the body, rolled the body onto one side, slid the bag underneath the body, and then "roll[ed] the body bag to the other side to get the body inside the bag, so he can zip it up and lift the body up."

*November 4, 2003 Autopsy*

On November 4, 2003, Josselson, who was accepted as an expert in forensic pathology and cause of death, conducted an autopsy on Edward's body.  Josselson opined that Edward died as a result of blunt-force head injury and manual strangulation.  He found five distinct lacerations on the top of Edward's head and on his forehead, ranging from one-half inch to three inches long and from superficial to "rather deep."  He opined that the lacerations on the top of the head were caused by blows, not a fall.  "When people fall, they usually don't fall on top of their head."  Regarding the forehead lacerations, he opined, "[T]he two on the right [forehead], or the one on the left [forehead] possibly could have been from a fall, but I don't think all three of them could have been caused by a fall. I think at least one of those was caused by a blow."  "I have never seen this many [lacerations] just from a fall...."  There was no injury to the brain, skull fracture or bleeding inside the skull. This indicated "that these blows were not extremely hard. They were moderately hard. But because of all the lacerations there was probably a great deal of bleeding which did contribute to the

5

death." Josselson discovered four areas of hemorrhage on the internal structure of the neck in the front and one in the large muscles on the side of the spinal column in the back of the neck. Josselson opined these injuries were caused by manual strangulation, "that is, someone putting their hands on the neck and applying some force on the neck." He acknowledged some common symptoms of strangulation were absent. The only abnormality discovered in Edward's internal organs was an enlarged heart. Despite the enlarged heart, Josselson did not believe the cause of death was a heart attack. Josselson examined the contents of Edward's stomach and found only a small amount of fluid and no identifiable food particles or pills. He testified that it generally takes about four to six hours for a person's stomach to empty after eating, but there is some variation.

During the autopsy, evidence technician Williams noticed a hair in a crease of Edward's neck going from right to left and another hair nearby lying on his shoulder. She collected the hairs as evidence. Williams did not recall seeing hairs on Edward's neck on November 3. Paramedic Petersen likewise did not recall seeing any hairs on Edward's neck on November 3, 2003. Two photographs that Williams took of Edward's head on November 3 did not show hairs in the area of his neck where the hairs were later found during the autopsy. Defense counsel suggested the hairs might have gotten on Edward's neck and shoulder when Edward's body was rolled into the body bag.

*November 4, 2003 Further Investigation*

After Josselson rendered an opinion that the death was a homicide, McBroom considered Reding, Ye and Ye's son suspects because they lived in the home and they were the last three people to have seen the victim alive. McBroom had the resource officer at D.'s school interview about a dozen of D.'s classmates and teachers on November 4, 2003. He interviewed Reding in Reding's Kaiser office from about 11:00 a.m. to noon on November 4, 2003. He also assigned Bob Oettinger, a Benicia police lieutenant, to investigate Reding's whereabouts on November 3, 2003 and based on Oettinger's report McBroom excluded Reding as a suspect. McBroom did not seize clothing or shoes from Reding or belonging to Reding. He did not obtain a blood sample from Reding. He never obtained a printout of Reding's Kaiser schedule for that day.

McBroom, Williams and other crime scene investigators returned to the Reding house on the evening of November 4, 2003 to collect evidence. Criminalist Tanya Beede searched for bloodstain evidence in the home. She examined multiple pairs of shoes found in the foyer for reddish-brown stains. A detective said he thought there was a shiny substance on a pair of brown sandals, so Beede tested the sandals with a presumptive test for blood and they tested positive. The sandals were collected as evidence. Reding testified that he had a "vague recollection" of pointing out a pair of sandals to the officers and said, "I think they were Linna Ye's." Reding testified that the sandals in evidence (i.e., those that were collected on November 4) looked like the sandals that belonged to Ye.

McBroom testified that on November 4 he observed a police officer ask Reding a question and heard Reding respond by pointing to the sandals and saying, "'Yeah, those are Linna Ye's shoes.'" Ye acknowledged that she wore the sandals, but denied that they were worn exclusively by her. Michael Jr. testified that each person in the family had a pair of shoes or sandals that they wore in the house, except Edward wore support stockings or went barefoot instead of wearing indoor shoes.

Damiean Sylvester, a Benicia police officer, walked around the outside of the Reding home on November 4, 2003, as it was being videotaped by a videographer. He looked for signs of forced entry and found none. He saw a footprint on top of a dirty air conditioning unit that appeared to be old, i.e., not made in the previous few days.

The officers asked Reding what he did with the debris from the bathroom and he directed them to the garbage can. Williams collected a trash bag inside that garbage can as evidence.

*November 5, 2003 Arrest, Interview and Examination of Ye*

On November 5, a SWAT team arrested Ye as she was seated in the back seat of a car in San Mateo. FN3 Multiple officers ran up to the car with weapons drawn, pulled her out of the back seat of the car onto the ground, and handcuffed her. At about 2:00 p.m. on November 5, McBroom interviewed Ye at a San Mateo police station. Ye testified that she was questioned there for four to five hours. After the interview, the police took Ye to the hospital to collect evidence, including blood and hair samples. Oettinger was present during the examination, and he observed what appeared to be blood stains on the shirt and thermal underwear pants Ye was wearing. Ye volunteered that the stains were menstrual blood. Oettinger also observed injuries or bruises on Ye's body and had photographs taken of them. Josselson was shown the photographs and asked if he could determine how old the bruises were. He testified, "[T]here is a great deal of variation from person to person as to how the bruises change colors, so ... [¶] ... [¶][i]t's hard to be very exact." "All I can say is they were not extremely recent.... I really am hesitant to try to age bruises since there is so much variation from person to person. They do not look like they are an hour or two old, but older than that, that is about as specific as I can be."

FN3. Ye testified that she was taking a nap in the back seat of her parents' car as she used the car to charge her cell phone. Ye's mother corroborated this testimony.

Ye was not charged with homicide until June 2004. McBroom testified that he waited for crime laboratory results before again arresting Ye.

*DNA Testing of Sandal and Bathroom Swabs*

Beede, who qualified as an expert in the field of DNA analysis,

testified that she conducted DNA testing on swabs taken from five areas of the left sandal.  In two areas (the right top strap and the bottom of the sandal), she obtained DNA evidence with a profile that matched Edward's.  In the left portion of the top of the sandal, the swab included the DNA of more than one person. Most of the DNA in that swab had a profile that matched Edward's. Three "types" (apparently alleles) of DNA in the swab were from a minor contributor and were present at a "much lower level" than the DNA that matched Edward's profile. "[T]hose three types [of DNA] were consistent with the types of Linna Ye at those locations."  However, the laboratory could not determine that the minor contributor DNA "matched" Ye because "not all the types of the minor contributor are present."  Similarly, a swab of the toe area of the sandal contained a mixture of DNA with the profile of the major contributor matching Edward's and the types of the minor contributor consistent with Ye's profile.  In another area, underneath the strap of the sandal, the swab again included the DNA of more than one person. Most of the DNA had a profile that matched Edward's and "[t]here were minor alleles, and some of [which] were consistent with Linna Ye's type at those locations." However, there were also two alleles that were foreign to both Edward and Ye.  Beede was not able to identify the other minor contributor, who could have been male or female.  For the swabs that contained a mixture of DNA, Beede could not tell when the DNA from the multiple sources had mixed. They could have been deposited on the sandal months apart. Moreover, the DNA did not necessarily come from blood. Sandals worn regularly by someone would be expected to have that person's DNA on them from, for example, skin cells that are deposited as a result of friction.

*Laboratory Analysis of Hair*

Brandy Spas, a senior criminalist for the Department of Justice, was qualified as an expert in the field of hair analysis and comparison. Spas compared hairs taken from the trash bag that Williams collected on November 4, 2003, with hair samples from Ye and D. by observing them under magnification. "[A]ll of the questioned hairs that I examined fell within the range of characteristics exhibited by the known hair standard[s]," which included length and color and for hairs subjected to microscopic examination the diameter, pigment, distribution of the pigment and other factors. When asked if she formed an opinion about whether the evidence hairs came from Ye, she responded, "[A]s a hair examiner, I can't say that a hair came from a specific person. All I can say is, it came from a person with similar hair characteristics." Spas testified that she could determine where the hairs were in their life cycle and she noticed that many of the hairs in the evidence sample were in an active-growth stage. "[T]he average person loses about a hundred hairs a day that just are falling out, sloughing out at the end of their life cycle. [¶] To get these hairs that have the roots that are actively growing, it takes some kind of force to pull that hair out, and you would not expect to find very many in a brush. The ... only reason you would find one in a brush[ ] is ... it was tangled[ ] and you forcefully pulled that hair out of your head."  However, she also testified that for "[s]ome people, it doesn't take very much to pull

their hairs out. Other people, you really have to pull pretty hard." There is no way of knowing how much force is required to pull a hair from a particular person's head because everyone is different.

Brian Wraxall, an expert in forensic serology and DNA comparison, compared the DNA in the two hairs collected from Edward's neck with hair and blood samples from Ye and a blood sample from Edward. Wraxall explained that a hair root or tissue attached to hair can be tested for nuclear DNA and the hair shaft itself can be tested for mitochondrial DNA. Mitochondrial DNA is inherited only from an individual's mother and mitochondrial DNA testing is much less discriminating than nuclear DNA testing. The hair from Edward's shoulder had tissue attached and the nuclear DNA profile from that tissue "matched Ms. Ye, but did not come from [Edward]." There was also some loose tissue in the packet that contained that hair and that tissue "matched" Edward. "[T]he two hairs matched up as far as mitochondrial DNA was concerned for Ms. Ye, but not for [Edward]."

*Credibility Issue*

Reding acknowledged that he testified falsely at a hearing held during the third trial but outside the presence of the jury. The testimony was about a phone conversation he had on the afternoon of September 24, 2008 after Sylvester had testified about the shoe print he saw on the air conditioning unit.

*Verdict, Motion for New Trial and Sentencing*

The jury, which was instructed on first and second degree murder, began deliberating at 2:35 p.m. on Thursday, October 2, 2008. On the afternoon of October 3, the jury asked for a readback of Beede's testimony about the sandals. On Monday, October 6, the jury asked for a readback of Josselson's testimony. At 3:15 p.m. that day, the jury returned a verdict of second degree murder.

On April 3, 2009, Ye (represented by new counsel) moved for a new trial on the ground her trial attorney provided ineffective assistance, inter alia, in failing to call an expert witness to challenge Josselson's conclusions regarding the cause of Edward's death. Following an evidentiary hearing, the motion was denied. The court then sentenced Ye to 15 years to life in prison.

<u>People v. Ye</u>, 2011 WL 1633239, **1-8 (April 29, 2011), also at Respondent's Ex. D.[1]  The facts

as set forth by the state court of appeal are presumed correct.  28 U.S.C. § 2254(e)(1).

II.  <u>Procedural History</u>

In 2004, the Solano County District Attorney charged petitioner with the murder of

Edward Reding.  (Clerk's Transcript ("CT") at 23.)

---

[1] Respondent's exhibits were lodged with the court on September 25, 2013.  (ECF No. 13-2.)

9

Petitioner's first two trials resulted in mistrials.  (See Facts, supra; CT 283.)  On October 6, 2008, a jury in the Solano County Superior Court convicted petitioner of second degree murder.  (CT 422-423.)  On May 5, 2009, the trial court sentenced petitioner to 15 years to life in state prison.  (CT 521.)

Petitioner appealed the judgment, and on April 29, 2011, the Court of Appeal for the First Appellate District affirmed the judgment in a reasoned decision.  People v. Ye, 2011 WL 1633239, supra.  On August 17, 2011, the California Supreme Court denied review.  (Resp. Ex. E.)

While her appeal was pending, on December 28, 2010, petitioner filed a petition for habeas corpus in the state court of appeal.  (Resp. Ex. F.)  On April 29, 2011, the court of appeal issued an Order to Show Cause on petitioner's claims that her trial attorney provided ineffective assistance of counsel by (1) failing to object to the prosecutor's interpretation of certain phone records in the closing argument and (2) failing to present expert testimony on the issue of the phone records.  The court referred the matter to the Solano County Superior Court for an evidentiary hearing on these issues and otherwise denied the petition.  (Resp. Ex. H.)  The court of appeal denied petitioner's subsequent request to expand the OSC to include two additional issues.  (Resp. Ex. I.)

Between September 2011 and April 2012, the superior court conducted hearings on petitioner's two ineffective assistance claims.  At the conclusion of the hearings, on April 13, 2012, the superior court denied the OSC.  (Id. at 224.)  In its written order to this effect, the superior court made factual findings as to the evidence presented in the evidentiary hearings.  (Resp. Ex. M.)

While those hearings were in progress, on January 11, 2012, petitioner filed a second petition for writ of habeas corpus with the superior court, seeking relief on claims not included in the OSC.  (Resp. Ex. L.)  On February 27, 2012, the superior court denied these claims as procedurally barred, as they had been presented on direct appeal and/or in petitioner's first state habeas petition.  (Id.)

/////

1   On June 7, 2012, petitioner, acting pro se, filed a third petition for writ of habeas corpus in

2   the California Court of Appeal, asserting claims previously raised in her first state habeas

3   petition.  On July 19, 2012, the court of appeal issued a summary denial of the petition.  (Resp.

4   Ex. N.)

5   On September 18, 2012, petitioner filed in the California Supreme Court a fourth petition

6   for writ of habeas corpus.  The petition was summarily denied on March 13, 2013.  (Resp. Ex. O.)

7   On May 16, 2013, petitioner filed the instant federal petition.  (Ptn.)

8   <u>ANALYSIS</u>

9   I. <u>AEDPA</u>

10   The statutory limitations of federal courts' power to issue habeas corpus relief for persons

11   in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective

12   Death Penalty Act of 1996 (AEDPA).  The text of § 2254(d) states:

13
14   > An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim-

15
16   > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

17
18   > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

19

20   As a preliminary matter, the Supreme Court has recently held and reconfirmed "that §

21   2254(d) does not require a state court to give reasons before its decision can be deemed to have

22   been 'adjudicated on the merits.'"  <u>Harrington v. Richter</u>, 131 S. Ct. 770, 785 (2011).

23   Rather, "when a federal claim has been presented to a state court and the state court has denied

24   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

25   of any indication or state-law procedural principles to the contrary."  <u>Id.</u> at 784-785, citing <u>Harris</u>

26   <u>v. Reed</u>, 489 U.S. 255, 265 (1989) (presumption of a merits determination when it is unclear

27   whether a decision appearing to rest on federal grounds was decided on another basis).  "The

28   presumption may be overcome when there is reason to think some other explanation for the state

11

1    court's decision is more likely." Id. at 785.

2        The Supreme Court has set forth the operative standard for federal habeas review of state

3    court decisions under AEDPA as follows:  "For purposes of § 2254(d)(1), 'an unreasonable

4    application of federal law is different from an incorrect application of federal law.'"  Harrington,

5    supra, 131 S. Ct. at 785, citing Williams v. Taylor, 529 U.S. 362, 410 (2000).  "A state court's

6    determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded

7    jurists could disagree' on the correctness of the state court's decision."  Id. at 786, citing

8    Yarborough v. Alvarado, 541 U.S. 652, 664 (2004).  Accordingly, "a habeas court must

9    determine what arguments or theories supported or . . . could have supported[] the state court's

10   decision; and then it must ask whether it is possible fairminded jurists could disagree that those

11   arguments or theories are inconsistent with the holding in a prior decision of this Court."  Id.

12   "Evaluating whether a rule application was unreasonable requires considering the rule's

13   specificity.  The more general the rule, the more leeway courts have in reaching outcomes in

14   case-by-case determinations.'"  Id.  Emphasizing the stringency of this standard, which "stops

15   short of imposing a complete bar of federal court relitigation of claims already rejected in state

16   court proceedings[,]" the Supreme Court has cautioned that "even a strong case for relief does not

17   mean the state court's contrary conclusion was unreasonable."  Id., citing Lockyer v. Andrade,

18   538 U.S. 63, 75 (2003).

19       The undersigned also finds that the same deference is paid to the factual determinations of

20   state courts.  Under § 2254(d)(2), factual findings of the state courts are presumed to be correct

21   subject only to a review of the record which demonstrates that the factual finding(s) "resulted in a

22   decision that was based on an unreasonable determination of the facts in light of the evidence

23   presented in the state court proceeding."  It makes no sense to interpret "unreasonable" in §

24   2254(d)(2) in a manner different from that same word as it appears in § 2254(d)(1) – i.e., the

25   factual error must be so apparent that "fairminded jurists" examining the same record could not

26   abide by the state court factual determination.  A petitioner must show clearly and convincingly

27   that the factual determination is unreasonable.  See Rice v. Collins, 546 U.S. 333, 338 (2006).

28   /////

12

1     The habeas corpus petitioner bears the burden of demonstrating the objectively

2  unreasonable nature of the state court decision in light of controlling Supreme Court authority.

3  Woodford v. Viscotti, 537 U.S. 19 (2002).  Specifically, the petitioner "must show that the state

4  court's ruling on the claim being presented in federal court was so lacking in justification that

5  there was an error well understood and comprehended in existing law beyond any possibility for

6  fairminded disagreement."  Harrington, supra, 131 S. Ct. at 786-787.  Clearly established" law is

7  law that has been "squarely addressed" by the United States Supreme Court.  Wright v. Van

8  Patten, 552 U.S. 120, 125 (2008).  Thus, extrapolations of settled law to unique situations will not

9  qualify as clearly established.  See e.g., Carey v. Musladin, 549 U.S. 70, 76 (2006) (established

10  law not permitting state sponsored practices to inject bias into a criminal proceeding by

11  compelling a defendant to wear prison clothing or by unnecessary showing of uniformed guards

12  does not qualify as clearly established law when spectators' conduct is the alleged cause of bias

13  injection).  The established Supreme Court authority reviewed must be a pronouncement on

14  constitutional principles, or other controlling federal law, as opposed to a pronouncement of

15  statutes or rules binding only on federal courts.  Early v. Packer, 537 U.S. 3, 9 (2002).

16     The state courts need not have cited to federal authority, or even have indicated awareness

17  of federal authority in arriving at their decision.  Early, supra, 537 U.S. at 8.  Where the state

18  courts have not addressed the constitutional issue in dispute in any reasoned opinion, the federal

19  court will independently review the record in adjudication of that issue.  "Independent review of

20  the record is not de novo review of the constitutional issue, but rather, the only method by which

21  we can determine whether a silent state court decision is objectively unreasonable."  Himes v.

22  Thompson, 336 F.3d 848, 853 (9th Cir. 2003).

23     "When a state court rejects a federal claim without expressly addressing that claim, a

24  federal habeas court must presume that the federal claim was adjudicated on the merits – but that

25  presumption can in some limited circumstances be rebutted."  Johnson v. Williams, 133 S. Ct.

26  1088, 1096 (2013).  "When the evidence leads very clearly to the conclusion that a federal claim

27  was inadvertently overlooked in state court, § 2254(d) entitles the prisoner to" de novo review of

28  the claim.  Id. at 1097.

II. Petitioner's Claims

A. Prosecutor Misconduct: Telephone Records

Petitioner claims that the prosecutor committed misconduct by effectively testifying as to the meaning of key phone records in his closing argument – specifically four calls, lasting roughly 20 seconds each, made to the Reding home on the day Edward died.  Petitioner asserts that the technical interpretation of these records should have been the subject of expert testimony. She contends that the prosecutor's conduct violated her rights under the Sixth Amendment Confrontation Clause.  (Ptn. at 20-26.)

Petitioner concedes that her trial counsel, Kathryn Barton, signed a written stipulation that the phone records could be introduced without foundational testimony from the custodian of records.  (CT 379-380.)

1. Facts

Petitioner points out that "[t]he time of death was crucial" in her trial, as petitioner was known to have left the house by 10:00 a.m. on the day Edward died.  (Ptn. at 10.)  The defense theory was that Edward "was killed by an intruder, a visitor, or a handyman who entered through the front door, which was kept unlocked during the day, sometime after 10:00 a.m., and Petitioner departed."  (Id. at 9.)

As to the evidence of the four short phone calls made to the Reding house between 10:00 a.m. and 2:00 p.m. that day – discussed below – the prosecutor argued as follows in his closing statement:

> What is this time line that you have that tells you this man was dead by 10:02 on November 3rd, 2003?
>
> . . . Over there on that table there's a phone record of the home that Ed Reding was murdered in, while Doctor Reding was at work, while Danny was in school, and while she was in the house with him.
>
> Beginning at 10:02 there's a phone call coming into Doctor Reding's home that lasts 20 seconds.  *And you know that was a no answer phone call*, just from that fact, and I'll explain that to you in a minute.
>
> At 11:19, someone called again for 21 seconds.  *You know that was a no answer.*  He was dead by the time that phone call was made.

14

At 12:34 another incoming call was made that lasted 20 seconds. *You know that one was a no answer*.  Why do you know that?  Because at 1:33 Benicia Dial-A-Ride called, and it lasted 20 seconds.  And remember Mr. Sims testifying that was no answer; there was no answer.  That call hooks up and rings until there is no answer.  Each and every one of these calls were the same length, within a second or two.

(13 RT 824-826) (emphasis added).

Petitioner's trial counsel, Barton, did not object to this line of argument or request a curative instruction.  Referring briefly to the four phone calls in her closing argument, she stated: "When the phone calls come in and they're not answered, there's been no testimony that Edward Reding ever even answered the phone when people called."  (13 RT 838.)  Thus she did not dispute the prosecutor's assumption that the calls went unanswered.[2]

The state court of appeal set forth the facts relevant to this claim as follows:

On September 23, 2008, counsel filed a written "Proposed Stipulation to Admit Business Records During Trial," which stated that with respect to the Reding home phone records, "testimony will not be needed by the custodian of records from SBC to establish a foundational requirement for such records to be used during trial[.]"  Counsel orally presented the stipulations to the court on the same day.  As part of the prosecution's case-in-chief, Sylvester testified that he obtained records for Reding's home phone via a search warrant.  The prosecutor then stated, "I think counsel is willing to stipulate that the records that we have subpoenaed to court, via Officer Sylvester, are admissible without any further testimony regarding their source," and defense counsel responded, "Correct. I would stipulate to the foundation basis."

The phone records for the Reding home number, Exhibit 3, were received in evidence without objection. They appear to be faxed copies of two computer printouts. FN5 The printouts each consist of a table under the heading, "Display Standard AMA Records." Numerical data is listed in the table under column headings such as TR ODE, CALL CODE, ANS IND, SER FEAT, CUSTOMER CONNECT (below, "CusConnect"), and CUSTOMER ELAPSE (below, "CusElapse"). For the terminating number (707) 747–6666 (the Reding residence home phone), the following data appears on both printouts (illegible digit marked with an asterisk):

FN5. The original exhibit also includes an attached search warrant affidavit, which we discuss post.

Cust. Date      31103  31103  31103  31103  31103

---

[2] The quality of Barton's representation concerning the phone records is the subject of petitioner's related IAC claim.

15

| | | | | | |
|---|---|---|---|---|---|
| CusConnect | 10:02:42 | 11:19:2* | 12:34:09 | 13:33:12 | 16:12:34 |
| CusElapse | 00:00:22 | 00:00:21 | 00:00:20 | 00:00:20 | 00:00:02 |

> The prosecutor did not call any witness to interpret these records. As noted, he nevertheless argued in closing that the records demonstrated that four incoming calls at 10:02 a.m., 11:19 a .m., 12:34 p.m. and 1:33 p.m. went unanswered.
>
> . . .
>
> Defense counsel did not object to the argument.  In her own closing argument, she told the jury, "When the phone calls come in and they are not answered, there's been no testimony that Edward Reding ever even answered the phone when people called. There was testimony that his foot hurt." In rebuttal, the prosecutor argued, "Counsel told you that there was no testimony that Ed Reding ever answered the phone.... [B]ut Mr. Sims testified, if you will remember, that not only did he call and there was no answer, but the word used by him was that, 'It was very unusual that Ed Reding wouldn't answer that phone.' ... It stuck in his mind to the extent that five years later he remembers that was very unusual.  Not just unusual, but it was very unusual that he didn't answer that phone."

People v. Ye, 2011 WL 1633239, at **8-9.  This is consistent with the court's review of the record.

On state habeas review, the superior court held an evidentiary hearing on the related question of whether Barton was ineffective in failing to object to the prosecutor's interpretation of the phone records, and in failing to present defense expert testimony on this issue.  In its April 13, 2012 order denying habeas relief, the superior court made the following factual findings:

> During trial, the prosecution argued that the phone records showed that various unanswered phone calls to the victim's home were made and that these unanswered calls supported the inference that the victim was no longer alive at the time of the calls.  Now there is evidence that the phone records show that these calls were in some technical sense 'answered.'  (Reporter's Transcript, Testimony of Barbara Grewen, Feb. 3, 2010, pp. 17-20.)  However, Petitioner presents absolutely no evidence that the phone calls were answered by a person, such as the victim, and not just a voicemail.  Petitioner also presents no evidence that any caller actually spoke to the victim or someone at the victim's home after placing one of these calls.  In fact, one of the calls which Petitioner now urges the phone records show was 'answered' was made by a witness who testified that he called the victim and his call was not answered.  (Reporter's Transcript, Testimony of Steven Sims, Sept. 24, 2008, pp. 7-9.)

(Resp. Ex. M.)  Having reviewed the transcript of the evidentiary hearing, the undersigned concludes that these findings are not rebutted by clear and convincing evidence.  See 28 U.S.C. §

16

1    2254(e)(1).

2          As to the superior court's conclusion that the calls were picked up by voicemail,

3    petitioner argues:

> In order for an incoming call to go to a voice mail, a second call
> from Reding household to the phone company's voice mail system
> would be electronically generated due to the forward technology.
> However, [the] phone records showed no second call following
> each of the 4 calls in question.  (Exhibit B: Evid. h: 49-52.)  Thus,
> this strongly indicated that the 4 calls were answered by a human,
> not electronic equipment.

8    (Ptn. at 23.)  This is based on the testimony of Barbara Grewen, an AT&T phone records expert

9    who testified at the state habeas evidentiary hearing.  (RT Evid. Hear. 50-53.)  However, Grewen

10   further testified that she could not tell from the existing records whether the four calls to the

11   Reding home went to voicemail, explaining that "[i]f this customer had a flat rate service, then

12   those calls to the voice mail service would not be recorded."  (RT Evid. Hear. 51.)  Based on the

13   records, her testimony was that the calls were "answered in some way," but she had "no idea"

14   whether they were picked up by a person or by voicemail.  (RT Evid. Hear. 51-52.)

15   2. State Court Decision

16         On direct appeal, the Court of Appeal for the First Appellate District concluded that

17   petitioner's claim of prosecutorial misconduct had been forfeited by Barton's failure to "make

18   specific objection to the prosecution argument and by her concession of the underlying issue in

19   her own argument."  People v. Ye, 2011 WL 1633239 at *9.

20         In the alternative, the court of appeal denied petitioner's claim on the merits:

> Ye contends that, when the prosecutor argued to the jury that the
> phone records supported an inference that the four incoming calls
> between 10:00 a.m. and 3:00 p.m. went unanswered, he committed
> misconduct and violated her federal constitutional rights to confront
> the evidence against her and to present rebuttal evidence in her own
> defense.
>
> When a prosecutor's conduct infringes on a specific guarantee of
> the federal constitution, it is subject to review under the standards
> applicable to that constitutional guarantee.  (See People v. Bell
> (1989) 49 Cal.3d 502, 533 (Bell ).)  In other contexts, "[a]
> prosecutor's behavior deprives a defendant of his [federal] rights
> 'when it comprises a pattern of conduct "so egregious that it infects
> the trial with such unfairness as to make the conviction a denial of
> due process."'  ([Citation]; accord, Darden v. Wainwright (1986)

17

477 U.S. 168, 181 ...; [citation].)  Conduct that falls short of that standard 'may still constitute misconduct under state law if it involves the use of deceptive or reprehensible methods to persuade the trial court or the jury.' [Citations.]"

. . .

We do not agree that the prosecutor's argument would lead a reasonable juror to believe that he was interpreting the records based on his own expert knowledge. FN6  As we note post, Ye's counsel herself drew the same inference from the records.

FN6. The prosecutor did not state or imply that he had expert knowledge about the meaning of the records. (Cf. Bell, supra, 49 Cal.3d at p. 539.)  Instead, the prosecutor argued to the jury that certain data in the phone records (which he accurately recited) combined with both Sims's testimony (which he also accurately recounted with the exception noted in fn. 5) and the jurors' common experience supported the inference he wanted the jury to draw. Ye's cited cases are distinguishable.

. . .

Ye argues that, had her trial attorney objected to the argument, the trial court would have been required to instruct the jury that the inference was not supported by the trial evidence, but could only be supported by additional foundational testimony. As Ye notes, Exhibit 3 was not a customer phone bill that would be familiar to most jurors. The headings "Customer Connect" and "Customer Elapse" may refer to the time that the particular phone at issue somehow connected with the outside phone network without necessarily corresponding with the amount of time the phone rang, if at all.  Moreover, the "elapse" of the connection does not self-evidently indicate that the phone stopped ringing without being answered.  Moreover, data on the records that was not cited by the prosecutor is inconsistent among the four calls, thus undermining the prosecutor's argument that the records exhibit a clear pattern that supports a common-sense inference that the four calls went unanswered. FN7

FN7. In particular, as Ye notes, the "Carrier Elapse" figure for the 10:02 a.m. call (00:00:54) is different from the "Carrier Elapse" figures for the other three calls (00:00:00). We further observe that a 4:12 p.m. incoming call on the records, which has a "Customer Elapse" figure of 00:00:02, shares numerous similarities with the 10:02 a.m. call ("OVS IND" 0; "PIC ID" 2882; "CARR DATE" 31103; "CARRIER ELAPSE" 00:00:54 or 00:00:34; "CES" 10; "ANI IND" 2 or 3) that are all inconsistent with the other three calls ("OVS IND" 1; "PIC ID" 0000; "CARR DATE" 00000; "CARRIER ELAPSE" 00:00:00; "CES" 00; "ANI IND" 0).

We need not decide, however, whether additional foundational testimony was required to support the prosecutor's proffered inference because Ye's trial counsel both forfeited and conceded the issue.  First, trial counsel forfeited the claim by failing to object

18

to the prosecutor's argument. [Citations omitted.]   Second, she conceded the point in her own closing argument. She told the jury, "When the phone calls come in and they are not answered, there's been no testimony that Edward Reding ever even answered the phone when people called," implicitly acknowledging that the incoming calls went unanswered. FN8

FN8. Ye argues her trial attorney "did not agree to the prosecutor's argument as to all the telephone calls." However, she made no attempt to distinguish among the calls or argue that any of them was something other than an unanswered incoming call.

(Id. at **10-11.)

3. Analysis

a. Procedural Default

In Rich v. Calderon, 187 F.3d 1064, 1066 (9th Cir. 1999) and Vansickel v. White, 166 F.3d 953 (9th Cir. 1997), the Ninth Circuit held that California's contemporaneous objection rule is an adequate and independent state procedural rule when properly invoked by the state courts. The Ninth Circuit has also concluded that the contemporaneous objection rule has been consistently applied by the California courts.  See Melendez v. Pliler, 288 F.3d 1120, 1125 (9th Cir. 2002).  Here, the state court deemed the instant claim procedurally barred.  Thus, on federal habeas review, the claim is procedurally barred absent a showing of cause and prejudice.

The cause standard requires the petitioner to show that "some objective factor external to the defense impeded counsel's efforts to construct or raise the claim."  McCleskey v. Zant, 499 U.S. 467, 493 (1991) (internal quotations omitted).   A petitioner may also show cause by establishing constitutionally ineffective assistance of counsel, but attorney error short of constitutionally ineffective assistance of counsel does not constitute cause and will not excuse a procedural default.  Id. at 494.  As discussed below, there is some evidence that petitioner's trial counsel rendered ineffective assistance by failing to investigate the meaning of the phone records. However, for reasons also set forth below, petitioner has not demonstrated that failure to consider this claim will result in a fundamental miscarriage of justice.  As petitioner has not shown prejudice, her claim is procedurally barred.

/////

/////

19

1    b. <u>AEDPA Review</u>

2        Alternatively, the undersigned considers petitioner's Sixth Amendment claim on the

3    merits.

4        The Confrontation Clause of the Sixth Amendment requires that a criminal defendant be

5    afforded the right to confront and cross-examine witnesses against him.  <u>See</u> <u>Pointer v. Texas</u>,

6    380 U.S. 400, 403 (1965).  The Confrontation Clause applies to all out-of-court testimonial

7    statements offered for the truth of the matter asserted, i.e., "testimonial hearsay."  <u>See</u> <u>Crawford</u>

8    <u>v. Washington</u>, 541 U.S. 36, 51 (2004).  While the Confrontation Clause bans the admission of

9    "testimonial hearsay" at trial, it does not apply to nontestimonial hearsay.  <u>Davis v. Washington</u>,

10   547 U.S. 813, 821 (2006) ("It is the testimonial character of the statement that separates it from

11   other hearsay that, while subject to traditional limitations upon hearsay evidence, is not subject to

12   the Confrontation Clause.").  The Supreme Court in <u>Crawford</u> singled out business records as an

13   example of non-testimonial hearsay.  <u>Id.</u> at 541 U.S. at 56.  <u>Compare</u> <u>Melendez-Diaz v.</u>

14   <u>Massachusetts</u>, 557 U.S. 305 (2009) (holding that "certificates of analysis" stating that a tested

15   substance was cocaine were testimonial and could not be admitted without cross-examination of

16   the document's author).

17       Even if statements violate the Confrontation Clause, they must have had a "substantial and

18   injurious effect or influence in determining the jury's verdict" – i.e., resulted in "actual prejudice"

19   – to warrant federal habeas relief.   <u>Mayes v. Premo</u>, 766 F.3d 949, 965 (9th Cir. 2014), quoting

20   <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993).

21       Here, petitioner contends that the prosecutor's statements about the "unanswered calls" in

22   his closing argument effectively made him a witness against petitioner, whom petitioner was not

23   able to cross-examine.[3]  However, the jurors knew that the prosecutor was not a witness against

24   petitioner, and that his argument – while interpreting the evidence – was not evidence.  Prior to

25   closing arguments, the trial court instructed them:

26   _____

[3] Assuming the phone records were "testimonial hearsay" within the meaning of <u>Melendez-Diaz</u>,
27   557 U.S. at 310, their admissibility is not at issue.  The parties stipulated to their admission.  <u>See</u>
     <u>Bullcoming v. New Mexico</u>, 131 S. Ct. 2705, 2709 (2011) (<u>Melendez-Diaz</u> holds that "[a]bsent
28   stipulation, . . . the prosecution may not introduce [a testimonial] report without offering a live
     competent witness to testify to the truth of the statements made in the report.").

1
2

> Evidence is the sworn testimony of witnesses, the exhibits admitted into evidence, and anything else I tell you to consider is evidence.

3
4

> Nothing that the attorneys say is evidence.   In their opening statements and closing arguments, the attorneys discuss the case. Their questions are not evidence.   Their remarks are not evidence. Only the witnesses' answers are evidence.

5

(RT 790.)

6       Because the prosecutor's statements about the phone records did not violate petitioner's

7   Confrontation Clause rights under clearly established federal law, petitioner is not entitled to

8   habeas relief on this basis.  Nor has petitioner shown "actual prejudice" from the prosecutor's

9   statements, as her own attorney assumed that the four 20-second phone calls were not picked up

10  by Edward or any other person, and to this day there is no clear evidence that they were.

11      Moreover, the state court reasonably determined that the prosecutor's conduct did not

12  deprive petitioner of her constitutional rights.  "The prosecutor may argue reasonable inferences

13  from the evidence presented[.]"  <u>Menendez v.  Terhune</u>, 422 F.3d 1012, 1037 (9th Cir. 2005),

14  citing <u>U.S. v. Young</u>, 470 U.S. 1, 8 & n.5 (1985).  "In determining whether a due process

15  violation has occurred as a result of comments made by the prosecutor in argument, courts ask

16  whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting

17  conviction a denial of due process.'"  <u>Menendez</u>, 422 at 1033-1034, quoting <u>Darden v.</u>

18  <u>Wainwright</u>, 477 U.S. 168, 181 (1986).

19      Here, even after a post-trial evidentiary hearing on the phone records, petitioner was not

20  able to show that the prosecutor's statements were meaningfully erroneous.  While it appeared

21  likely that the calls had been picked up by voicemail, even a phone records expert could not be

22  sure whether they were or not.  Thus the prosecutor's statements that the calls were "not

23  answered" did not infect the trial with unfairness to an unconstitutional degree.  Because the state

24  courts' denial of this claim was reasonable under AEDPA, petitioner is not entitled to federal

25  habeas relief on this basis.

26  B.  <u>Ineffective Assistance: Telephone Records</u>

27      In a related claim, petitioner asserts that Barton provided ineffective assistance by failing

28  to investigate the meaning of the telephone records and failing to introduce evidence on this issue.

1  (Ptn. at 26-27.)  The last reasoned decision on this claim was issued April 12, 2012 on state

2  habeas review, following the evidentiary hearing this claim.[4]  (Resp. Ex. M.)  Evidence adduced

3  at the hearing as to the meaning of the phone records is discussed above.

4           Petitioner's trial attorney, Barton, testified at the hearing as to the IAC claims.  After

5  being appointed as petitioner's lawyer for the 2008 trial, Barton acquired case materials, which

6  included two pages of phone records attached to a search warrant.  (RT Evid. Hear. 61-62.)

7  Barton knew the phone records came from the Reding house, but did nothing further to

8  investigate how the records were created or what the column headings meant.  She did not consult

9  with an expert to interpret the records, nor did she contact someone at the phone company to help

10 her determine what they meant.  (RT Evid. Hear. 62-63.)  Barton testified that she had no tactical

11 reason for not investigating the phone records' meaning – i.e., she did not think such an

12 investigation would harm petitioner's defense.  (RT Evid. Hear. 64-65.)  However, she denied not

13 consulting an expert because she "just didn't think about it at the time[.]"  (RT Evid. Hear. 65.)

14 Rather,

15          I think what I relied on was the fact that the victim was invalid at
            the time,[5] and as I made in my argument, I thought that he may not
16          have answered the phone.  They had a Dial-a-Ride guy testify that
            perhaps he didn't answer the phone because he didn't get to the
17          phone, but I attacked the time of death another way.

18 (RT Evid. Hear. 65.)

19          Following Barton's testimony, a defense expert testified that, in his opinion, she had

20 rendered ineffective assistance as to the phone records.  Peter Keene, a law professor at Golden

21 Gate University Law School, testified as an expert on the effective assistance of counsel in a

22 criminal case.  (RT Evid. Hear. 95.)  After reviewing the case, he formed an opinion that

23 _____

24 [4] Respondent points out that petitioner raised her IAC claims related to the telephone records on
   direct appeal (Resp. Exs. C, E), in her first habeas petition (Resp. Ex. F), in her third habeas
25 petition (Resp. Ex. N), and in her fourth habeas petition (Resp. Ex. O).  Each state court presented
   with the claims denied relief.

26
27 [5] Michael Reding testified that, on the morning of his death, Edward had a plantar wart: "a painful
   virus on the bottom of his foot" that made it painful for him to walk.  Before leaving for work that
   day, Reding scraped the callous off Edward's foot, put medicine on it, and wrapped it in a towel.
28 (10 RT 297-298.)

1   petitioner "did not receive effective assistance of counsel under the 6th Amendment" standard as

2   articulated in <u>Strickland</u>.  (RT Evid. Hear. 96.)  Specifically, he found Barton's representation

3   ineffective in that she did not investigate the phone records' meaning, present expert testimony on

4   this subject, or object to the prosecutor's characterization of the phone records in closing

5   argument.  (RT Evid. Hear. 96-99.)

6          Asked about "specific details that lead you to [the] conclusion" that Barton rendered

7   ineffective assistance, Professor Keane testified:

8                  Here Ms. Barton did not investigate anything about the phone
                   records to determine whether or not they would show that the phone
9                  was answered, or was not answered, and the phone records were in
                   the case right from the beginning[.] . . .[I]f something is in the case
10                 that a defense attorney should at least follow the path down on, the
                   failure to follow that path down on it has to be explained as some
11                 reasonable, professional judgment or tactical judgment, and she
                   said she didn't have any tactical judgment.
12

13   (RT Evid. Hear. 102-103.)

14   1.  <u>State Court Decision</u>

15          The superior court denied petitioner's IAC claim on habeas review, reasoning:

16                 In order to state a prima facie case for ineffective assistance of
                   counsel (IAC) one must show that counsel's performance was
17                 objectively deficient, and that the petitioner was prejudiced as a
                   result of counsel's deficient performance.   (<u>Strickland v.
18                 Washington</u> (1984) 466 U.S. 668, 687.)  This test is disjunctive and
                   if a petitioner fails to show either element, the claim for IAC fails.
19                 (<u>Strickland</u>, <u>supra</u>, 466 U.S. at p. 697.)

20                 . . .

21                 In this case, Petitioner has failed to show prejudice.

22                 . . .

23                 Here, there is an abundance of evidence supporting the verdict:  e.g.
                   evidence of motive, physical evidence, DNA evidence, evidence of
24                 Petitioner's actions following the death of the victim, and evidence
                   of the physical condition in which Petitioner was found after the
25                 victim's death.  Objectively, there is no reasonable probability that
                   the outcome of this case would have been different based on this
26                 new interpretation of the phone records.  Without evidence that a
                   person actually answered the phone calls in question, the
27                 prosecution's case has not been materially undermined.

28   (Resp. Ex. M at 1-3) (citations to California cases omitted).

2. <u>Analysis</u>

The Supreme Court has enunciated the standards for judging ineffective assistance of counsel claims. <u>See</u> <u>Strickland v. Washington</u>, 466 U.S. 668 (1984). First, a defendant must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. <u>Strickland</u>, 466 U.S. at 688. To this end, the defendant must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment. <u>Id.</u> at 690. The court must then determine, whether in light of all the circumstances, the identified acts or omissions were outside the wide range of professional competent assistance. <u>Id.</u> Second, a defendant must affirmatively prove prejudice. <u>Id.</u> at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." <u>Id.</u> <u>See also</u> <u>United States v. Murray</u>, 751 F.2d 1528, 1535 (9th Cir. 1985); <u>United States v. Schaflander</u>, 743 F.2d 714, 717-718 (9th Cir. 1984) (per curiam).

As to ineffective assistance claims in the federal habeas context, the Supreme Court has instructed: "The standards created by <u>Strickland</u> and § 2254(d) are both 'highly deferential,' . . . and when the two apply in tandem, review is 'doubly' so[.] . . . . When § 2254(d) applies, the question is not whether counsel's actions were reasonable. The question is whether there is any reasonable argument that counsel satisfied <u>Strickland</u>'s deferential standard." <u>Richter</u>, 562 U.S. at 105 (internal citations omitted).

On AEDPA review, the state court reasonably applied <u>Strickland</u> in determining that, even if Barton rendered ineffective assistance as to the phone records, petitioner did not prove prejudice in light of (1) the other evidence against her and (2) the absence of evidence that Edward or any other person answered the phone after 10:00 a.m., disproving the prosecutor's theory about time of death. Thus this claim should be denied.

C. <u>Prosecutor Misconduct: Search Warrant</u>

Petitioner claims that the prosecutor committed misconduct when he "sneaked into evidence Officer Sylvester's hearsay affidavit in support of the search warrant for the phone

24

1   records."  Specifically, she asserts that defense counsel orally stipulated to the admission of

2   phone records without seeing the exhibit.  "The next day the prosecutor placed into evidence, as

3   People's Exhibit 3, not only the two pages of phone records to which defense counsel stipulated,

4   but also a 10 page search warrant affidavit prepared by Officer Sylvester to obtain those records. .

5   . . No one told [defense counsel] that when the exhibit went into the jury room, Sylvester's

6   affidavit would go, too.  The affidavit contains substantial inadmissible hearsay and damaging

7   allegation[s.]"  (Ptn. at 28.)

8          Petitioner further claims that her trial counsel provided ineffective assistance by failing to

9   object to the jury's receipt of the affidavit, and that the trial court violated her due process rights

10  by failing to hold an evidentiary hearing on the issue of the affidavit on habeas review.  (Id. at 28-

11  32.)  Respondent argues that this claim is procedurally defaulted and also fails on the merits.

12  1. State Court Decision

13         The state court of appeal set forth the relevant facts as follows:

14             Ye argues that the prosecutor committed misconduct by attaching a
               search warrant affidavit to the Exhibit 3 phone records, thus causing
15             the affidavit (which was not received in evidence by the court) to be
               viewed by the jury.
16

17             . . .

18             As noted ante, the prosecutor and defense counsel stipulated before
               trial to the admissibility of Reding's home phone records, as well as
19             records for Reding's and Ye's cell phones. The prosecution's first
               witness was Steven Sims, the Benicia Dial–a–Ride dispatcher. The
20             prosecutor showed Sims Exhibit 3, which was premarked for
               identification, and had him identify "the fifth entry on this log of
21             numbers" as a Dial–a–Ride phone number and confirm that the
               entry reflected his call to the Reding home on or after 1:30 p.m. on
22             the afternoon of November 3, 2003. Later that day, the prosecutor
               moved Exhibit 3 into evidence without objection. The prosecutor's
23             sixth witness was Sylvester. Also later that day, while Sylvester
               was on the stand, the prosecutor reminded the court of the parties'
24             stipulation about the admissibility of the exhibit. He never asked
               Sylvester to identify the exhibit or read from it. The exhibit was not
25             mentioned again during the presentation of evidence.

26             . . .

27             We conclude Exhibit 3 is currently properly before us and we may
               properly consider the exhibit when assessing Ye's claim on appeal.
28

1  People v. Ye, 2011 WL 1633239, at **11-13.[6]

2          After concluding claim was forfeited by failure to object, state court alternatively

3  considered it on the merits:

4          Even if it were not forfeited, the claim fails. Ye argues the inclusion
           of the affidavit in Exhibit 3 if sent to the jury, whether intentional
5          or inadvertent, amounted to prosecutorial misconduct because it
           placed otherwise inadmissible materials into evidence at trial. She
6          argues the misconduct violated her confrontation rights because the
           affidavit constituted hearsay and that the contents of the affidavit
7          were highly prejudicial.

8          The People dispute whether the search warrant affidavit was
           included as part of Exhibit 3 at any relevant time during the
9          trial.FN12 We disagree. The record confirms that the search
           warrant and affidavit were in fact part of the exhibit at both the first
10         and second trials.

11         . . .

12         In its final instructions to the jury before deliberations, the court did
           state that the exhibits would be provided to the jury during
13         deliberations. There is, however, no other indication in the record
           that any of the exhibits actually were delivered to the jury room.
14         There were a total of 71 prosecution exhibits and 26 defense
           exhibits received in evidence. These included not only documents
15         and photographs, but forensic evidence (e.g. the victim's clothing
           (Exhibit 29), tools found in the downstairs bathroom (Exhibit 30),
16         blood samples (Exhibit 32), a trash bag full of debris (Exhibit 34),
           sandals (Exhibit 33), and several exhibits containing human hair
17         (Exhibits 31, 35–38).)  We would view it as inherently implausible
           that the entirety of the exhibits received in evidence at trial,
18         including forensic samples, were simply carried into the jury room
           without any prior review, without any record, and without specific
19         jury request.

20         Often certain types of trial exhibits (such as weapon, controlled
           substances and forensic samples) require special handling and may
21         need to be displayed to the jury in the controlled setting of the
           courtroom with the judge, the parties and counsel present. We
22         would expect that exhibits ordinarily would not be sent to the jury
           room without at least review by the court, the courtroom clerk, and
23         counsel, and with a record made of what is being provided. In the
           absence of a clear record otherwise, we will not presume that court
24         personnel and the court itself would cavalierly ignore the
           responsibility to maintain the integrity of the trial evidence and
25         surrender control of that evidence to a lay jury without careful, and
           documented, review.

26

27  [6] The court has reviewed Officer Sylvester's affidavit in support of the November 4, 2003 search
    warrant, included among the Documentary Exhibits to the Petition for Writ of Habeas Corpus
28  (Ex. 7).

1
2

> Ye cannot show on this record that she was prejudiced by inclusion
> of the affidavit in Exhibit 3 because she cannot demonstrate that the
> jury ever actually saw it.

3   Id., 2011 WL 1633239, at **13-14.

4   2. Analysis

5   The standard for whether alleged prosecutorial misconduct rises to a federal due process

6   violation is set forth above.  In short, the question is whether the prosecutor's actions "'so

7   infected the trial with unfairness as to make the resulting conviction a denial of due process.'"

8   Menendez, 422 at 1033-1034.  Moreover, on collateral attack a constitutional trial error requires

9   relief only if it "had substantial and injurious effect or influence in determining the jury's

10   verdict."  Brecht, 507 U.S. 519.  The Ninth Circuit has held that "the Brecht standard should

11   apply uniformly in all federal habeas corpus cases under § 2254."  Bains v. Cambra, 204 F.3d

12   964, 977 (9th Cir. 2000).

13   Here, it is not necessary to decide whether this claim is procedurally barred, as petitioner

14   has not carried her burden to show prejudice from any alleged constitutional violation.   She

15   supplies a declaration from the trial judge's bailiff, who states that, at petitioner's third trial, he

16   does not recall having deviated from his usual practice: "to take all items that have been admitted

17   into evidence into the jury room at the beginning of the jury's deliberation."  (Documentary

18   Exhibits to the Petition for Writ of Habeas Corpus, Ex. 9.)

19   However, it is not clear that the affidavit was admitted into evidence at trial as part of

20   People's Exhibit 3, which otherwise consisted of phone records.  The Clerk's Transcript lists

21   Exhibit 3 as "Phone records for home phone (707) 747-6666," identified as the Redings' home

22   number.  (9 RT 220-221.)  When Officer Sylvester testified, Exhibit 3 was described as "cell

23   phone records" for the Reding home (9 RT 220-221); no mention was made of an affidavit.

24   Earlier at trial, Exhibit 3 was described as a "log of numbers."  (9 RT 72.)  The prosecutor did not

25   discuss the search warrant or affidavit in argument.  Nor is there any evidence that the prosecutor

26   "sneaked" it into evidence in order to improperly place it before the jury.

27   Moreover, the lawyer who represented petitioner in her motion for new trial testified at a

28   June 2010 post-conviction hearing, as to the affidavit allegedly attached to Exhibit 3:  "Now, I'm

1    the person who did the new trial motion, and I don't remember seeing that.  You know, I am

2    certain that I looked through the exhibits and I don't remember seeing that exhibit[.]"  (Ex. G at

3    4.)  Although petitioner pursued this prosecutorial misconduct claim on appeal and in state habeas

4    proceedings, there is no clear indication that the jury that convicted her ever saw the affidavit or

5    that any misconduct was committed.

6         Even assuming <u>arguendo</u> that Officer Sylvester's affidavit was included in Exhibit 3, and

7    despite the fact that it contained inadmissible hearsay, petitioner has not shown that its contents

8    had a "substantial and injurious effect" on the jury's verdict.  The basic timeline of events

9    surrounding Edward Reding's death was presented through witness testimony.   Similarly, the

10   contents of the affidavit concerning conflicts between the members of the Reding household,

11   including arguments between petitioner and Michael Reding, was largely cumulative of witness

12   testimony.  In light of all the other evidence presented, the affidavit – which was never so much

13   as mentioned at trial – could hardly be said to be the lynchpin of the prosecution's case.

14        Based on the foregoing, the undersigned concludes that the state courts' denial of

15   petitioner's prosecutorial misconduct claim was objectively reasonable under AEDPA.  As

16   petitioner has also failed to show ineffective assistance or prejudice under <u>Strickland</u>, that

17   argument for federal habeas relief should also be rejected.

18   D.  <u>Ineffective Assistance: Cause of Death Evidence</u>

19        Petitioner claims that her trial attorney rendered ineffective assistance because she did not

20   adequately cross-examine the coroner who conducted Edward's autopsy.  Petitioner asserts that

21   prosecution pathologist Dr. Josselson testified on four separate occasions, giving inconsistent

22   testimony that should have been more effectively challenged at her third trial.

23        Most notably, Dr. Josselson changed his testimony over "which injury came first" – the

24   blunt force injuries or the strangulation.  At petitioner's third trial, he stated that he believed

25   Edward was likely rendered unconscious by multiple blows to the head, then strangled.  (9 RT

26   121, 132.)  Petitioner asserts that defense counsel could have "substantially undercut his

27   testimony" by pointing out his past inconsistencies.  Petitioner further asserts that defense counsel

28   should have called a defense expert "to undercut the prosecution's theory that Edward was

28

1    strangled."  As to prejudice, petitioner argues that "[i]f there was no strangulation, then

2    Josselson's theory of death falls apart," and the only possible conviction was for involuntary

3    manslaughter.  (Ptn. at 32-35.)

4         In denying this claim, the state court of appeal reasoned as follows:

5             Ye argues her trial attorney provided ineffective assistance by
             failing to adequately challenge Josselson's testimony about the
6             cause of Edward's death both in cross-examination and by failing to
             call a defense expert witness to contradict Josselson's testimony.
7             Ye raised this issue below in her unsuccessful motion for new trial.

8             *1. Josselson's Prior Testimony*

9              Ye argues Josselson's testimony that Edward was killed by a
             combination of blunt force trauma and manual strangulation could
10            have been effectively impeached by his prior testimony at the
             preliminary hearing and first and second trials, and contends that
11            there was no conceivable strategic reason for failing to do so. We
             disagree on both counts.
12
             Ye focuses on Josselson's lack of certainty about whether Edward
13            was hit on the head and then strangled, or strangled and then hit on
             the head.  There were no significant inconsistencies between
14            Josselson's prior testimony and his testimony at the third trial. On
             all four occasions, Josselson testified that he could not be sure
15            whether Edward was strangled or hit on the head first. When he
             offered an opinion, he consistently testified that the blows probably
16            occurred first because that sequence would explain why he bled
             from the head wounds (he was still alive when the blows were
17            inflicted) or why the strangulation resulted in few injuries (he was
             unconscious at the time) or both. He consistently testified that the
18            blows to the head could have rendered Edward unconscious. At the
             second trial, he also held out the possibility that Edward was
19            strangled first and that the bleeding from the head wounds would be
             explained because his heart would have kept beating for a few
20            minutes after he was strangled. However, this theory did not
             contradict his testimony at the third trial; it was consistent with his
21            testimony that he could not be sure whether the strangulation or
             head blows occurred first.
22
             In any event, Ye never explains why it would matter to the jury or
23            to her defense whether the blows to the head or the manual
             strangulation occurred first. The critical questions were whether
24            Edward died from a fall or from an assault and when the death
             occurred. Any dispute about the sequence of the mechanisms of his
25            death added nothing to the prosecution's case that Ye rather than a
             third party caused the death.
26
             Because the claim lacks merit, we need not consider whether Ye's
27            trial attorney might have had a strategic reason for failing to cross-
             examine Josselson on the matter.
28

                                              29

*2. Defense Expert Witness*

Ye also argues that her trial attorney provided ineffective assistance by failing to call Dr. Paul Herrmann as a witness to contradict Josselson's testimony about the cause of Edward's death. On appeal, Ye argues that Herrmann's testimony would have undermined Josselson's testimony that Edward was strangled and thus undermined the evidence he was assaulted with an intent to kill. We need not address the merits of this argument because Ye cannot show that her trial attorney's performance was deficient in not presenting this testimony. Therefore, we reject the claim.

*a. Factual Background*

In support of the motion for new trial, Ye presented the declaration and testimony of Paul Herrmann, a forensic pathologist with more than 40 years of experience. Herrmann averred that he had been retained by Ye's trial attorney before the third trial to review and evaluate Josselson's autopsy report. He reviewed the autopsy report, photographs of the crime scene and Josselson's preliminary hearing testimony. Herrmann took notes during his review and, although he did not remember talking to Ye's trial attorney after the review, he was "sure" that he did.

At the hearing on the motion for new trial and in his declaration in support of the motion, Herrmann testified that he did not believe Edward's death was accidental. He believed it was a homicide. He also did not believe Edward died solely due to the head wounds. Edward might have suffered acute heart failure in response to an attack due to his poor medical condition. "[T]here are other things that obviously indicate that there was a struggle, or some type of increased activity going on at about the time of this man's death, and under those circumstances, an enlarged heart can be ... a contributing factor to the death." FN13  Also, Edward could have died when his air supply was cut off as a result of manual strangulation or positional asphyxiation. Herrmann testified that it could not be determined to a medical certainty that Edward was manually strangled. Herrmann's original notes indicated that he could not dispute the cause of death, as Josselson's conclusion of a combination of blunt-force trauma and manual strangulation was "certainly ... a possibility." If Edward was unconscious, it would have been possible, with just two fingers and very little pressure, to cut off his airway and cause his death without causing a typical symptom of strangulation, which was missing. It was also a "small possibility," consistent with the evidence, that Edward was knocked unconscious due to blows on his head, which would allow for easier obstruction of the airways without much compression.

FN13. Clarifying terminology, Herrmann testified, "I wouldn't say that the heart attack is the cause of death in this case.... [¶] ... [¶] ... I don't call it a heart attack. Most of us think of a heart attack as a thrombus of the coronary artery. It's an acute cardiac arrhythmia causing death. So you can call it a heart attack if you want to, but that's not the usual term for a heart attack, but sudden death from heart disease."

In her motion for new trial, Ye argued that Herrmann's testimony could have raised a reasonable doubt about whether Edward was murdered. The court rejected the argument. Herrmann in fact opined that Edward's death was a homicide. Noting that it had presided over two full trials and one partial trial in the case and was very familiar with the facts, the court concluded that Herrmann "had nothing to really say that was going to be of assistance to the defense." "[T]here was really no difference as to whether the cause of death was from the striking on the head or the strangulation.... [¶] ... He actually either died of a heart arrhythmia after a sudden excitement and events of being struck on the head, or he passed out from being struck on the head and in the slumped position with his head up against the wall and compressed on his chest, the airway was closed and he asphyxiated himself. I mean, it all comes down to the same thing."

*b. Analysis*

The trial court rejected the new trial motion on the ground that Herrmann's testimony could not raise a reasonable doubt about whether Edward was murdered. On appeal, however, Ye argues the testimony could have raised a reasonable doubt about whether the perpetrator acted with malice aforethought, that is whether the crime was murder or manslaughter. Her argument might find support in the law. . . .[7]

However, two unresolved issues preclude us from finding ineffective assistance of counsel. First, it is not clear on this record that Herrmann advised Ye's attorney before trial that his testimony would support the claim she now makes. The only substantial difference between the opinions expressed by Hermann and those of Josselson was that Herrmann did not believe that manual strangulation could be established as a matter of reasonable medical certainty. He agreed that Josselson's conclusion of a combination of blunt-force trauma and manual strangulation was "certainly ... a possibility." Ye's trial attorney may well have had reasonable tactical reasons for electing not to present Herrmann's testimony, particularly since Hermann confirmed that this was a homicide, whatever the exact mechanism of death. She might well have concluded that it would be preferable to focus Ye's defense on her alibi and denial of any responsibility for Edward's death (a tactic that seems to have been reasonably successful in the first trial) rather than attempting to mitigate the responsibility of what she alleged was a culpable third party. "[D]ecisions ... whether to put on witnesses are matters of trial tactics and strategy which a reviewing court generally may not second-guess. [Citation.]" (<u>People v. Mitcham</u> (1992) 1 Cal.4th 1027, 1059.)

<u>People v. Ye</u>, 2011 WL 1633239, **15-17.

Having reviewed the trial record of defense counsel's cross examination of Dr. Josselson (9 RT 130-135) and other record materials (e.g., CT 462-469), the undersigned concludes that the

---

[7] Citations omitted.

31

1   state courts' denial of this claim was an objectively reasonable application of the <u>Strickland</u>

2   standard under AEDPA.  Thus petitioner is not entitled to federal habeas relief on this ground.

3   E.  <u>Ineffective Assistance: Cross-Examination of Dr. Reding</u>

4          Petitioner claims that her trial attorney was ineffective when she failed to cross-examine

5   Michael Reding Sr. about changes in his testimony between petitioner's first and third trials.

6   Petitioner's claim concerns two topics: (1) the ownership of a pair of sandals found at the house

7   that were determined to contain traces of Edward's blood; and (2) the fact that Reding's friend

8   Ann Greenbaum was present on the night he cleaned up the bathroom, which he did not mention

9   when testifying about the cleanup at the first trial.  Petitioner claims her attorney's omissions

10  were prejudicial because such cross-examination would have undercut Reding's credibility,

11  objectivity, and presumed memory of events.  (Ptn. at 35-38.)

12         As to petitioner's IAC claim regarding the sandals, the state court of appeal reasoned as

13  follows:

> Ye argues on appeal that her attorney could have impeached Reding's testimony that the sandals in evidence belonged to Ye because "at the first trial [he] made no claim that these brown sandals were [ Ye]'s." FN14   In fact, at the first trial Reding testified with greater specificity than at the third trial that he was sure he never wore the sandals in evidence, that his father never wore sandals in the home, that his sandals looked different from the sandals worn by D. or Ye, and that his sandals looked different from the sandals in evidence. This testimony supported an inference that the sandals in evidence belonged to D. or Ye. Ye does not argue that an ambiguity about whether they belonged to her or D. would assist her case. Ye made no effort at trial to raise suspicions about her son's culpability. Because Reding's testimony at the first trial was specific and it supported an inference that the sandals in evidence belonged to Ye, a reasonably competent attorney could conclude there was a danger of prejudice in using the testimony to impeach Reding at the third trial and thus could reasonably decide not to do so.

24  2011 WL 1633239, at *19.

25         As to petitioner's IAC claim regarding Greenbaum's presence at the cleanup, the state

26  court of appeal reasoned:

> On direct examination, Reding was asked how he chose to clean up the bathroom after Edward's body was removed and he responded, "I chose to clean it up myself. It felt very impersonal to have some

32

service [come to clean it up], and I felt a duty to my father to clean it up, so I stayed and *a friend came over to sit vigil with me* and I cleaned the bathroom up that night." (Italics added.) In other words, he volunteered the information that someone accompanied him as he cleaned the bathroom. On cross-examination, Reding acknowledged that friend was Greenbaum, the person who accompanied Reding on his trip to the health retreat shortly after Edward returned home from the hospital in August 2003. At the first trial, Reding had not mentioned that anyone was with him while he cleaned the bathroom. However, he was not specifically asked if he was accompanied by anyone at that time.

Ye argues that her trial attorney should have impeached Reding with his failure to mention Greenbaum when he described his clean-up of the bathroom. She postulates that her attorney would have elicited testimony that Reding deliberately omitted mention of Greenbaum at the first trial, which would suggest he was being less than fully candid on the witness stand, or that he forgot about Greenbaum when he testified at the first trial, which would suggest his memory was unreliable. As we have noted however, it is difficult to effectively impeach a witness with a lack of response to a question that was never asked. Moreover, the fact that at the third trial Reding volunteered the information that Greenbaum was with him during the clean-up would seriously undermine any implication that Reding deliberately withheld the information at the first trial. Regarding Reding's unreliable memory, defense counsel already had other more potent impeachment evidence.

People v. Ye, 2011 WL 1633239, *21.

Having reviewed Reding's testimony on these matters at petitioner's first and third trials and his cross-examination at the third trial, the undersigned concludes that the state courts' denial of these ineffective assistance claims was objectively reasonable under the AEDPA/Strickland standard. Thus petitioner is not entitled to federal habeas relief on either ground.

F.  Ineffective Assistance: Testimony of Dr. Reding's Son

Petitioner argues that her trial counsel was ineffective for failing to object to hearsay testimony by the victim's grandson, Michael Jr., about petitioner's alleged threats to Michael Sr. Petitioner argues that this testimony was excluded at her first trial, and her attorney's failure to object at her third trial was prejudicial, as Michael Jr.'s testimony was damaging to petitioner and "shored up his father's shaky credibility."  (Ptn. at 36-37.)

On direct appeal, the state court addressed this claim as follows:

/////

33

1
2

Ye argues her trial attorney provided ineffective assistance by failing to object to Michael Jr.'s hearsay testimony that Reding told him about Ye's threats before November 3, 2003.  [FN 15]

3
4

[FN 15] Ye argued in her opening brief that trial counsel at the first trial successfully moved to exclude this evidence as hearsay. However, the People showed in their opposition that this was incorrect, and Ye conceded her error in her reply brief.

5
6
7
8
9
10
11
12
13
14
15
16
17
18
19

Ye's claim fails because the testimony was not inadmissible hearsay. Evidence Code section 1236 provides, "Evidence of a statement previously made by a witness is not made inadmissible by the hearsay rule if the statement is consistent with his testimony at the hearing and is offered in compliance with Section 791." Evidence Code section 791, subdivision (b) provides, "Evidence of a statement previously made by a witness that is consistent with his testimony at the hearing is inadmissible to support his credibility unless it is offered after: [¶] ... [¶] ... [a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen."  At the time Michael Jr. presented the challenged testimony, Reding had already testified about Ye's threats and defense counsel had attempted to impeach him by eliciting an acknowledgement that he first wrote down the alleged threats at the request of the district attorney in 2004 or 2005. The clear implication of the cross-examination was that the threat were fabricated or exaggerated after Edward's death in order to inculpate Ye.  Indeed, in opening argument, defense counsel had told the jury, "The doctor will pin down this time when he goes on vacation as the pivotal point in this case. He will say although he's been with Ms. Ye for three years, within three months she becomes a dangerous woman, threatening him. Those threats are told later. Months later he makes a list. The reality is, nobody else hears about the threats, and if they do, they are looking back from 2008 to 2003. No one comes forward and says, [']I, too, heard these threats.' This is something he made up ."

20
21
22

In this context, Michael Jr.'s testimony about Reding's prior consistent statements were admissible under Evidence Code sections 791, subdivision (b) and 1236 to bolster Reding's credibility.

23

People v. Ye, 2011 WL 1633239, **21-22.

24

First, the court does not review the propriety of the state court's application of its own

25

evidentiary rules.  "[F]ederal habeas corpus relief does not lie for errors of state law." Estelle v.

26

McGuire, 502 U.S. 62, 67 (1991).  Second, in light of the court of appeal's conclusion that

27

Michael Jr.'s testimony was admissible, petitioner has not shown that her attorney's failure to

28

1    object to its admission constituted ineffective assistance.   As the state courts' denial of this claim

2    was objectively reasonable under AEDPA, petitioner is not entitled to federal habeas relief on this

3    ground.

4    G.   Ineffective Assistance:  Testimony of Detective McBroom

5             At petitioner's trial, Officer McBroom, a former Benicia police detective, testified about

6    being called to the Reding house to investigate the circumstances of Edward's death.  (9 RT 135-

7    157.)  After the death was determined to be a homicide, McBroom's initial three suspects were

8    Dr. Reding, petitioner's son, and petitioner.  (9 RT 158-160.)  The next day, McBroom and other

9    officers arrested petitioner in San Mateo.  (9 RT 161-162.)

10            McBroom testified that he directed Lieutenant Bob Oettinger to investigate Michael Sr.'s

11   whereabouts on the day of Edward's death and, as a result of Oettinger's report, excluded

12   Michael Sr. as a suspect.  (13 RT 774-776.)  Petitioner claims that her trial counsel rendered

13   ineffective assistance "when she failed to object to Officer McBroom's implied hearsay testimony

14   that Officer Oettinger investigated Michael Sr.'s whereabouts on November 3, 2003, and as a

15   result they excluded Michael Sr. as a suspect.  These statements should have been excluded as

16   improper implied hearsay."  (Ptn. at 37.)  Petitioner argues that her attorney's failure to object

17   was prejudicial, as it "eliminated any challenge to Michael Sr.'s testimony that he left his house at

18   8:00 a.m. and did not return until after his father was dead."  (Id.)

19            The state court of appeal addressed this claim as follows:

20                 Ye argues her attorney provided ineffective assistance by failing to
                  object to McBroom's testimony that he eliminated Reding as a
21                suspect based on an investigation report he received from Oettinger.

22                *1. Factual Background*

23                In its rebuttal case, the prosecution recalled McBroom and elicited
                  testimony that he was the lead detective on Edward's homicide and
24                that he directed Oettinger to investigate Reding's whereabouts on
                  November 3, 2003. The prosecutor then asked:
25
                  "[Prosecutor:] Did you learn information from—did you, yourself,
26                learn information, the results of the investigation from Lieutenant
                  Oettinger?
27
                  "[McBroom:] Yes, sir.
28

                                              35

"[Prosecutor:] Did you cause Doctor Reding to be investigated further as a result of what it is you learned from ... Oettinger?

"[Defense Counsel:] Objection, double hearsay.

"THE COURT: It's not asking for hearsay. It's just asking for his actions, so I will permit him to answer this question yes or no.

"[McBroom:] Can you repeat the question?

"[Prosecutor:] As a result of the report from ... Oettinger, did you cause any further investigation to be conducted as it relates to Doctor Reding's whereabouts?

"[McBroom:] No, I did not.

"[Prosecutor:] At that time did you exclude Doctor Reding as a suspect, based on what you had learned?

"[McBroom:] Yes, sir.

"[Defense Counsel]: Objection, double hearsay.

"THE COURT: The objection is overruled."

Oettinger never testified about the investigation of Reding. In his final closing argument, the prosecutor argued, "There is some intimation [in the defense closing argument] that '[Reding] was never a suspect.' Well, you heard Detective McBroom testify, 'I ordered people to investigate Doctor Reding. We investigated [D.] ..., and we investigated the defendant.' And who was eliminated as a result of those investigations? Two out of three of them. The third one sits in this courtroom." Defense counsel did not object to this argument.

*2. Analysis*

Ye argues her trial attorney provided ineffective assistance by failing to object to McBroom's rebuttal testimony about the investigation of Reding. The People note that Ye objected twice on hearsay grounds, but the objections were overruled, and they contend the court's ruling was correct. Ye responds that her trial attorney did not adequately object to all of the objectionable questions and that the court's action in overruling of her objections violated his Confrontation Clause rights.

The evident purpose for which the testimony was elicited was to obviate defense arguments that the police investigation ignored other possible suspects, including Reding, and focused solely on Ye. Defense Counsel argued that the "circle" of the investigation was "too small." She said "Myopic means can't really see, or have this one focus on my client and ignore the rest of the world, ignore the rest of the circle. They should have pushed that circle bigger. It should have included some other people in the circle when it came to the collection of evidence, when it came to an investigation of

this crime." She argued the failure of the police to collect physical evidence from Reding. As the court observed in overruling the defense objections to McBroom's testimony, the evidence could be properly received for a limited nonhearsay purpose—to explain the detective's actions in defining the scope of his investigation.

Ye's argument is that the testimony should still have been excluded as hearsay because it essentially communicated the content of out-of-court statements—Oettinger's statements about the statements of people he questioned during his investigation of Reding—for the purpose of proving the truth of both sets of statements. In other words, McBroom's testimony communicated to the jury that Oettinger's investigative report accounted for Reding's whereabouts on November 3, 2003, for the purpose of proving that Reding had a valid alibi for the time period in which Edward might have been murdered. (See Bell, supra, 49 Cal.3d at p. 532 [prosecutor committed misconduct by asking question that was broader than necessary to make relevant point and that mentioned inadmissible hearsay]; People v. Douglas (1990) 50 Cal.3d 468, 514 [" '[e]vidence of a declarant's statement that is offered to prove, not the truth of the matter stated in such statement expressly, but the truth of the matter that is stated in such statement by implication, is hearsay evidence' "; italics added]; People v. Melton (1988) 44 Cal.3d 713, 743–744 [evidence should have been excluded where "the principal purpose of the prosecutor's inquiry was to suggest simply that [one witness] did not believe [another witness], [and][t]he jury was invited to agree with [that] assessment"; italics added and omitted]; Evid. Code, §§ 350, 352.)

However, since the evidence was admissible for the more limited purpose, Ye's trial attorney forfeited the issue by failing to request a limiting admonishment or instruction to the jury that the evidence should not be considered evidence of the truth of the implied results of Oettinger's investigation, and for not objecting to the prosecutor's final argument that Reding and D. were "eliminated" as suspects as a result of the investigation. (See People v. Proctor, supra, 4 Cal.4th at pp. 543–544.) Further, Ye again fails to affirmatively meet her burden of establishing prejudice and the likelihood of a different result had an appropriate limiting instruction been given.

People v. Ye, 2011 WL 163329, **18-19.

As with the preceding claim, the state court of appeal determined that the challenged testimony was admissible under state evidence law. Moreover, petitioner's trial counsel did object to McBroom's testimony, twice. Having reviewed the record and relevant case materials, the undersigned concludes that the state courts' denial of this claim was objectively reasonable under the AEDPA/Strickland standard. Thus petitioner is not entitled to federal habeas relief on this ground.

/////

1    H.  <u>Ineffective Assistance: Stomach Contents</u>

2           Petitioner claims that her trial attorney rendered ineffective assistance by failing to argue

3    that Edward's stomach contents on the morning of his death, as determined in the autopsy,

4    undercut the state's argument that he was killed before petitioner left the house at 10:00 a.m.

5    "Nor did trial counsel challenge the prosecutor's argument, contrary to the record, that Edward

6    did not eat breakfast that morning."  (Ptn. at 37-38.)  Petitioner argues that these omissions were

7    prejudicial because the time of death was a crucial element of the case, and the digestion evidence

8    suggested that Edward was alive when petitioner left the house.  (<u>Id.</u>)

9           The state court of appeal addressed this claim as follows:

10                  Ye argues her trial attorney provided ineffective assistance by
                    failing to argue to the jury that the evidence that Edward's stomach
11                  was empty proved he was killed after Ye had left the home.

12                  Josselson testified that Edward's stomach contained only a small
                    amount of fluid and no identifiable food particles or pills, and he
13                  told the jury it generally takes about four to six hours for a person's
                    stomach to empty after eating, although there is some variation. Ye
14                  testified that she made breakfast for Edward and ate breakfast with
                    him after she returned from taking D. to school. Because school
15                  began at 8:00 a.m., she presumably returned home around that time.
                    If Edward ate between 8:00 and 8:30 a.m., Josselson's testimony
16                  would raise considerable doubt about whether he died by 10:00
                    a.m.  However, no other evidence corroborated Ye's testimony
17                  about when Edward ate that morning. The only other evidence on
                    the subject was Reding's testimony that Edward typically got up at
18                  5:00 or 6:00, took his vitamins, ate cereal or oatmeal, and read the
                    paper, and that when Reding got up at about 7:00 a.m. on
19                  November 3, 2003, Edward was already awake and dressed. On this
                    evidence, the jury could have reasonably inferred that Edward ate
20                  sometime between 5:00 and 7:00 a.m., or three to five hours before
                    10:00 a.m. In light of Josselson's testimony, that timeline would
21                  have been consistent with a finding that Ye killed Edward at about
                    10:00 a.m. Alternatively, the jury could have inferred (as the
22                  prosecutor contended in closing argument) that Edward never ate
                    breakfast that morning because Ye killed him before he had a
23                  chance to do so. That scenario also would have been consistent with
                    Josselson's testimony.
24

25    <u>People v. Ye</u>, 2011 WL 1633239, *22.  Having reviewed the record, including defense counsel's

26    closing argument, which attacked several aspects of the state's case but did not include an

27    argument about the digestive evidence, the undersigned concludes that the state court's decision

28    on this claim was objectively reasonable under the AEDPA/<u>Strickland</u> standard.

I. <u>Cumulative Error</u>

Petitioner asserts that the cumulative errors and resulting prejudice at her trial deprived her of her federal right to due process and a fair trial. (Ptn. at 38.)  Having reviewed petitioner's individual claims, above, the undersigned concludes that petitioner has not shown these alleged errors cumulatively prejudiced her or otherwise violated her federal due process rights.  Thus petitioner is not entitled to federal habeas relief on this ground.

Accordingly, IT IS HEREBY RECOMMENDED that the petition for writ of habeas corpus be denied.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

Dated:  June 10, 2015

_____
CAROLYN K. DELANEY
UNITED STATES MAGISTRATE JUDGE

2 / ye0972.hc

39